2017 UT App 38

## THE UTAH COURT OF APPEALS

RICK J. LINDSEY,
Appellee,

*v.*

KAREN M. LINDSEY,
Appellant.

Opinion
No. 20150769-CA
Filed March 2, 2017

Fourth District Court, Heber Department
The Honorable Fred D. Howard
No. 134500010

Douglas B. Thayer and Mark R. Nelson, Attorneys
for Appellant

Dean C. Andreasen, Diana L. Telfer, Troy L. Booher,
and Julie J. Nelson, Attorneys for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which JUDGES
STEPHEN L. ROTH and DAVID N. MORTENSEN concurred.

POHLMAN, Judge:

¶1     Rick J. Lindsey and Karen M. Lindsey were married for almost twenty years, and during that time the value of Mr. Lindsey's premarital business interests substantially appreciated. The issue on appeal is whether the trial court properly granted summary judgment awarding those business interests solely to Mr. Lindsey, as his separate property, during the Lindseys' divorce proceeding. We affirm.

BACKGROUND

¶2     Mr. and Ms. Lindsey were married in November 1996.[1] They had one child together, and they each had minor children from prior marriages. The parties initiated divorce proceedings in early 2013, and they obtained a decree of divorce in 2015.

¶3     Both before and during the marriage, Mr. Lindsey held considerable business interests in the insurance industry. When the parties married in 1996, Mr. Lindsey owned Evolution Insurance Group and its subsidiaries (collectively, Evolution) and was part owner of Prime Holdings Insurance Services Inc. and its subsidiaries (collectively, Prime Holdings). In November 1997, about a year after the parties married, Mr. Lindsey's interests in Evolution were merged into Prime Holdings. Mr. Lindsey then became CEO of Prime Holdings and obtained a substantial ownership interest in that entity.

¶4     At that time, Mr. Lindsey's business interests were valued at approximately $3.6 million.[2] During the parties' marriage, those interests appreciated in value. By December 2012, Mr. Lindsey's equity in Prime Holdings was worth approximately $6 to $7 million. And in June 2014, Mr. Lindsey's equity in Prime Holdings was valued at approximately $10.9 million.

¶5     Due to Mr. Lindsey's employment with Prime Holdings as well as his ownership of Prime Holdings stock, the Lindseys

---

1. We view the facts—which are largely undisputed—and all reasonable inferences drawn therefrom in the light most favorable to Ms. Lindsey, against whom partial summary judgment was granted. *See Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600.

2. The parties and the trial court used this estimated value of Mr. Lindsey's business interests to approximate the value of his premarital holdings.

enjoyed a high standard of living during their marriage. Mr. Lindsey was highly compensated via his annual salary, bonus, car allowance, and vacation payout. Due to his equity in the company, Mr. Lindsey also received large cash dividends from Prime Holdings between 2011 and the end of 2012, which totaled over $2 million. Because Mr. Lindsey elected to receive certain dividends in stock rather than cash, Mr. Lindsey also received fifty-seven shares of Prime Holdings stock between 2004 and 2012.

¶6     Ms. Lindsey was not employed outside the home at the time of the parties' marriage or during the marriage. Ms. Lindsey was responsible for meeting many of the parties' household and family needs, while Mr. Lindsey handled most of the parties' finances and most of the tasks related to financing and building their marital home.

¶7     Ms. Lindsey also supported Mr. Lindsey's efforts to strengthen relationships with his clientele. When clients or business associates came to visit, sometimes with their families, Ms. Lindsey took on the additional responsibilities associated with those visits—preparing guest rooms and welcome baskets, cooking, cleaning, assisting in laundry, and entertaining. On one occasion, she even loaned her car to their visiting guests. But Ms. Lindsey did not otherwise provide services for Prime Holdings or act as its employee.

¶8     As noted above, in early 2013 the parties initiated divorce proceedings. They resolved by stipulation many issues related to their separation, but they were unable to agree on the amount of alimony to be paid to Ms. Lindsey, the division of their marital property, and whether or how Mr. Lindsey's business interests would be divided.

¶9     Mr. Lindsey moved for partial summary judgment asserting that, as a matter of law, his premarital interests in Evolution and Prime Holdings, together with any appreciation or enhancement of their value, were his separate property. He

asserted that he was presumptively entitled to retain that property following divorce and no equitable principles called for a different result.

¶10 To preempt any argument to the contrary, Mr. Lindsey averred that his premarital business interests had not been commingled with the marital estate or augmented, maintained, or protected by any effort of Ms. Lindsey. Mr. Lindsey also asserted that no extraordinary circumstances warranted awarding a portion of his business interests to Ms. Lindsey, arguing that the parties had benefitted from Mr. Lindsey's work efforts while married; Ms. Lindsey's contributions to the marriage would "be reflected in an award of alimony"; and the rate of return on his business interests was below average for a closely held company and attributable to his premarital holdings rather than Mr. Lindsey's work effort while married, particularly given the significant salary and dividends received by Mr. Lindsey during the marriage. Thus, according to Mr. Lindsey, there was "no marital value" in his business interests.

¶11 In response, Ms. Lindsey did not challenge the initial characterization of Mr. Lindsey's business interests as his separate property. Rather, she asserted that separate property may become subject to equitable distribution when it has been consumed or has lost its identity through commingling; when "the other spouse has contributed to the enhancement, maintenance, or protection of that property"; or when "the distribution of separate property achieves a fair, just, and equitable result." Ms. Lindsey claimed that all three principles applied and that factual disputes precluded resolution of those issues on summary judgment.

¶12 With regard to commingling, Ms. Lindsey asserted that, at one point in the marriage, she had been "aware that [Mr. Lindsey] needed money for his business." Therefore, when she received $54,000 from the sale of real property she had owned with her prior husband, she "turned the money over" to Mr.

Lindsey, who "took [it] and told [her] he put it into his business." Ms. Lindsey also alleged that, among other things, Mr. Lindsey's acquisition of fifty-seven shares of Prime Holdings stock during the parties' marriage created a fact issue as to commingling because "[a]ll dividends ha[d] been historically used in the marriage as marital income."

¶13    As to her enhancement of Mr. Lindsey's business interests, Ms. Lindsey cited her "efforts to grow [the] business" by entertaining and hosting business-related guests; discussing Mr. Lindsey's business in conversations with him; supporting Mr. Lindsey in his profession; and enabling Mr. Lindsey to attend to his business by caring for the parties' child and other children from prior marriages, maintaining the parties' residence, and attending to other household duties.

¶14    Finally, Ms. Lindsey asserted that the court could "award an interest in [separate property] when equity requires." Ms. Lindsey argued, without elaboration, that the trial court was required to consider several factors before fashioning an equitable property division, and "it [would be] more appropriate . . . to hear the equitable issues more fully at trial where the [c]ourt can observe the parties' demeanor" and "hear all the evidence." Ms. Lindsey asserted that if the court awarded Mr. Lindsey's business interests to him, prior to trial, the court might not be able to achieve an equitable outcome, but she did not specify how that might occur or point to disputed facts that would bar summary judgment on that ground.

¶15    On reply, Mr. Lindsey addressed each allegedly disputed fact in turn. With regard to commingling, Mr. Lindsey submitted a forensic accountant's declaration that the fifty-seven shares of Prime Holdings received during the marriage were not marital income but "a return on Mr. Lindsey's premarital stock holdings." Regarding the $54,000 allegedly provided to him for investment in Prime Holdings, Mr. Lindsey pointed to Ms. Lindsey's deposition, in which she stated that she did not

remember "exactly the conversation [they] had the day [she] handed [Mr. Lindsey] the check," and that Mr. Lindsey "[c]ould have done anything" with it—like depositing it into "[s]ome joint account of his" or "possibl[y]" depositing it into her marital account. Mr. Lindsey claimed the $54,000 went toward "marital expenses," and he submitted a declaration from Prime Holdings' CFO, who reported that none of the Lindseys' "personal funds . . . were invested in Prime Holdings" during the relevant year.

¶16    As to the alleged enhancement of his business, Mr. Lindsey noted that neither Ms. Lindsey's household duties nor her clientele-related activities were in dispute. According to Mr. Lindsey, even assuming Ms. Lindsey's claims in that regard were correct, she had never been involved "in the creation, organization, development, or growth of [his] business nor was she ever employed by the business," and her efforts did not warrant an equitable distribution of his property.

¶17    During the summary judgment hearing, the parties agreed that if Mr. Lindsey retained his business interests as part of the property division, alimony would be awarded to Ms. Lindsey in the divorce decree. Mr. Lindsey's counsel conceded that "alimony undoubtedly will be ordered in this case," and Ms. Lindsey's counsel concurred, noting that "this [case] has an alimony portion to it." Ms. Lindsey's counsel did not assert that the court might be unable to award sufficient alimony following trial or suggest that a decision regarding Mr. Lindsey's business interests needed to be postponed on that basis.

¶18    At the close of the hearing, the trial court granted the motion for partial summary judgment. The court later issued a written decision, which set forth the court's conclusions that specific facts were undisputed and outlined the court's rationale for rejecting Ms. Lindsey's arguments.

¶19    With regard to commingling, the court concluded that "there is no evidence to support [Ms.] Lindsey's allegation that the [$54,000] from the sale of her premarital residence [was]

invested in or loaned to Prime Holdings." In addition, "[b]ased on the evidence presented," the fifty-seven shares of stock received by Mr. Lindsey during the marriage constituted a return on his premarital business interests and "d[id] not, therefore, constitute personal income earned by Mr. Lindsey during the marriage. Accordingly, the [s]hares do not constitute a commingling of marital income with Mr. Lindsey's premarital business interests in Prime Holdings."

¶20   With respect to her contribution to the business, the court concluded, among other things, that "Ms. Lindsey has had no involvement in the operation of Mr. Lindsey's business interests. Additionally, Ms. Lindsey's assistance in entertaining business clients was infrequent and had no material impact in augmenting or enhancing the value of Mr. Lindsey's business interests." Thus, the court determined that Ms. Lindsey's efforts were insufficient to support "the conclusion that [she] augmented or enhanced the value of Mr. Lindsey's business interests."

¶21   Last, with regard to the exception for extraordinary circumstances, the court concluded that "a party must be allowed a reasonable return on . . . premarital capital" before "concluding the increase in value was created during the marriage and is deemed to be marital property." Given the low rate of return on Mr. Lindsey's business interests, the court attributed all appreciation thereof to Mr. Lindsey's premarital holdings "rather than his [marital] work effort," particularly given the significant salary and dividends Mr. Lindsey received, which "drew down the value of Prime Holdings." The court noted that the dividends alone totaled over $2 million. The court also determined, "[b]ased on the uncontroverted evidence," that Mr. Lindsey was compensated "commensurate with his work effort" and did not "leav[e] money in Prime Holdings to grow the business." There was thus "no marital value in Prime Holdings," and the trial court therefore awarded Mr. Lindsey's business interests solely to him, as his separate property.

¶22 Trial was then held on the remaining issues—alimony and division of the marital estate. Following the trial, the court awarded substantial monthly alimony to Ms. Lindsey and divided the marital estate in a manner that heavily favored her, largely in line with Mr. Lindsey's proposed distribution. While Ms. Lindsey received substantially more assets than debt, Mr. Lindsey received substantially more debt than assets. Indeed, Mr. Lindsey was required to assume nearly all marital debt, a substantial figure attributable primarily to the parties' marital home.

## ISSUES AND STANDARD OF REVIEW

¶23 Ms. Lindsey challenges the trial court's grant of partial summary judgment, which awarded Mr. Lindsey's business interests solely to him, as his separate property. Ms. Lindsey claims that the ruling was premature and substantively incorrect. She asserts that, had the court waited until trial and properly addressed the issue, she would have been awarded some portion of the business's appreciated value based on her contributions or as necessary to achieve a fair, just, and equitable property division.

¶24 Summary judgment is appropriate "if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a).[3] Ordinarily "[a]n appellate court reviews a trial court's legal conclusions and ultimate grant or denial of

---

3. Utah Rule of Civil Procedure 56 was amended in 2015, after the motion for summary judgment was argued and decided. But because the 2015 amendments did not alter "substantive Utah law" with regard to rule 56, we cite the current version of the rule. Utah R. Civ. P. 56 advisory committee notes; *accord Porter v. EB Golf LLC*, 2016 UT App 82, ¶ 7 n.3, 372 P.3d 709.

summary judgment for correctness," *see Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (citation and internal quotation marks omitted), and the parties do not suggest this court should deviate from that general rule for purposes of this appeal.

¶25    However, we view the appropriate standard of review in this case as an unsettled question. Clearly, we apply a correctness standard when reviewing a court's determination that there were no genuine issues of material fact. But it is less clear whether a court's legal conclusions and grant or denial of summary judgment regarding characterization and distribution of property are also reviewed for correctness or are afforded the same deference as would have applied had those determinations been made at the conclusion of a trial.

¶26    We note that, as a general principle, trial courts "have considerable discretion concerning property distribution in a divorce proceeding and their determinations enjoy a presumption of validity." *Dahl v. Dahl*, 2015 UT 79, ¶ 119 (citation and internal quotation marks omitted). "Determining and assigning values to marital property" is a matter committed to the trial court, over which it is permitted "broad latitude, and its judgment is not to be lightly disturbed, so long as it exercises its discretion in accordance with the standards set by this court." *Rappleye v. Rappleye*, 855 P.2d 260, 263 (Utah Ct. App. 1993) (citations and internal quotation marks omitted). As a result, we generally "defer to a trial court's categorization and equitable distribution of separate property," *Keyes v. Keyes*, 2015 UT App 114, ¶ 29, 351 P.3d 90, and uphold its determinations in that regard "unless a clear and prejudicial abuse of discretion is demonstrated," *see Dahl*, 2015 UT 79, ¶ 119 (citation and internal quotation marks omitted).

¶27    No Utah appellate decision has addressed whether this deference is limited to determinations made after a trial on all of the substantive issues, or whether it also applies on summary judgment to rulings based on undisputed facts. Moreover, as we

note below, Utah appellate courts have taken different approaches to the standard of review at this juncture, where deferential and correctness standards appear to intersect. And those decisions do not offer clear principles for determining whether deference is afforded on summary judgment in a specific context.

¶28    In some instances, a singular standard of correctness has been applied on review of summary judgment, although deference may have been afforded had the court resolved the issue following a trial. *See, e.g.*, *Southam v. South Despain Ditch Co.*, 2014 UT 35, ¶¶ 9, 24, 337 P.3d 236 (applying a correctness standard on the issue of waiver); *Bahr v. Imus*, 2011 UT 19, ¶¶ 12–18, 250 P.3d 56 (applying a correctness standard on the issue of equitable estoppel). In other cases, a measure of deference has been folded into the standard of review on summary judgment, to account for the discretion afforded trial courts on the ultimate issue. *See, e.g.*, *Jones v. Farmers Ins. Exch.*, 2012 UT 52, ¶¶ 6, 13, 286 P.3d 301 (including a deferential standard on the issue of whether the validity of the insurance claim was fairly debatable); *IHC Health Services, Inc. v. D & K Mgmt., Inc.*, 2003 UT 5, ¶ 6, 73 P.3d 320 (including a deferential standard on the issue of waiver); *Withers v. Jepsen*, 2011 UT App 8, ¶¶ 2, 5–6, 246 P.3d 1215 (examining whether the district court exceeded its discretion by declining to make equitable adjustments in partition and sale matters).

¶29    The latter approach may be appropriate when summary judgment turns on a trial court's determinations regarding the equitable distribution of separate property. Undoubtedly, a strong basis for affording deference is trial courts' superior advantage in observing witnesses and resolving factual disputes; and that advantage does not exist on summary judgment, which, "by definition, cannot resolve genuine disputes of fact." *See Bahr*, 2011 UT 19, ¶ 15. But the discretion afforded trial courts to characterize and distribute separate and marital property does not rest solely on their superior advantage in fact-finding. That

discretion also stems from the broad range of permissible avenues in reaching an equitable property division, a matter over which the trial court has substantial latitude, for "[t]here is no fixed formula upon which to determine a division of assets in a divorce action." *See Rappleye*, 855 P.2d at 263. A trial court's judgment on these matters need only fall within the spectrum of appropriate resolutions, and we see no reason to circumscribe that range more tightly at summary judgment than we would post-trial.

¶30 However, we need not decide which standard—deference or correctness—more appropriately fits the trial court's legal conclusions and summary judgment ruling in this case because even applying a correctness standard, giving no deference to the trial court's decision, we would still affirm the trial court's grant of summary judgment awarding Mr. Lindsey's business interests to him, as his separate property.


ANALYSIS

¶31 When distributing "marital property in a divorce proceeding, the overriding consideration is that the ultimate division be equitable—that property be fairly divided between the parties." *Granger v. Granger*, 2016 UT App 117, ¶ 15, 374 P.3d 1043 (brackets, citation, and internal quotation marks omitted). To that end, a trial court must first "identify the property in dispute and determine whether it is marital or separate." *Dahl v. Dahl*, 2015 UT 79, ¶ 121 (brackets, citation, and internal quotation marks omitted). Marital property ordinarily includes "all property acquired during marriage," "whenever obtained and from whatever source derived." *Dunn v. Dunn*, 802 P.2d 1314, 1317–18 (Utah Ct. App. 1990) (citation and internal quotation marks omitted). Separate property ordinarily includes premarital property, gifts, and inheritances, including any appreciation that may accrue during the marriage. *See Dahl*, 2015 UT 79, ¶ 143; *Mortensen v. Mortensen*, 760 P.2d 304, 308 (Utah 1988).

¶32    The presumption is that marital property will be divided equally while separate property will not be divided at all. *See Dahl*, 2015 UT 79, ¶ 121; *Dunn*, 802 P.2d at 1323. Married persons have a right to separately own and enjoy property, and that right does not dissipate upon divorce. *See Mortensen*, 760 P.2d at 308. Thus, equity generally requires that "each party retain the separate property he or she brought into the marriage, including any appreciation" thereof. *Dunn*, 802 P.2d at 1320, 1323; *accord Dahl*, 2015 UT 79, ¶ 143; *Mortensen*, 760 P.2d at 308.

¶33    But separate property "is not totally beyond a court's reach." *Elman v. Elman*, 2002 UT App 83, ¶ 19, 45 P.3d 176 (brackets, citation, and internal quotation marks omitted). Before carving property out of the marital estate, a trial court must consider whether circumstances warrant an equitable override of the separate-property retention rule. *See Henshaw v. Henshaw*, 2012 UT App 56, ¶ 15, 271 P.3d 837. Three circumstances have been identified under Utah law as supporting an award of separate property at the time of divorce. These exceptions are when separate property has been commingled; when the other spouse has augmented, maintained, or protected the separate property; and in extraordinary situations when equity so demands. *See Mortensen*, 760 P.2d at 308; *Dunn*, 802 P.2d at 1320. The latter two exceptions are at issue here.[4]

---

4. The first exception—commingling—is not at issue on appeal but was addressed during the proceedings below. Ms. Lindsey asserted that factual disputes as to commingling precluded summary judgment in favor of Mr. Lindsey, citing $54,000 she allegedly turned over to Mr. Lindsey for investment in his business and fifty-seven shares of Prime Holdings stock Mr. Lindsey received during the marriage. On appeal, Ms. Lindsey does not challenge the trial court's dismissal of her commingling claim. Instead, she asserts for the first time that factual disputes as to the $54,000 and the fifty-seven shares also precluded summary judgment as to the remaining exceptions. Because

(continued…)

## I. The Contribution Exception

¶34 Ms. Lindsey asserts that the trial court incorrectly determined, "on summary judgment based on undisputed facts, that Ms. Lindsey's contributions to Mr. Lindsey's business . . . were infrequent and immaterial" and were "insufficient to augment or enhance the value of Mr. Lindsey's business interests as a matter of law." According to Ms. Lindsey, the trial court "misapplied the undisputed facts to governing case law" and erroneously "remov[ed] the parties' largest asset from the marital pie, leaving such an equitable discrepancy[] that even if Ms. Lindsey were awarded the entire marital estate, [her award] would not come close to equaling the size of the now missing piece of the pie."

¶35 Under the contribution exception, a spouse's separate property may be subject to equitable distribution when "the other spouse has by his or her efforts or expense contributed to the enhancement, maintenance, or protection of that property, thereby acquiring an equitable interest in it." *Mortensen*, 760 P.2d at 308. This exception may be satisfied when one spouse brings assets into the marriage and the other spouse's prudent investment of those assets substantially increases their value, *see Dubois v. Dubois*, 504 P.2d 1380, 1381 (Utah 1973), or when marital funds are expended or marital debt is incurred for the benefit of one spouse's separate property, *see Schaumberg v. Schaumberg*, 875 P.2d 598, 602–03 (Utah Ct. App. 1994). In addition, this court has contemplated that the exception might apply when one spouse works for a business owned by the other

----

(…continued)

those arguments were not "presented to the district court in such a manner that the court had a meaningful opportunity to rule on [them]," we decline to address them on appeal. *See Dahl v. Dahl*, 2015 UT 79, ¶ 207 (citation and internal quotation marks omitted).

spouse but is not "paid a wage or salary," *see Rappleye v. Rappleye*, 855 P.2d 260, 262–63 (Utah Ct. App. 1993), or when a spouse elects to forgo salary or related compensation that would have benefited the marriage so that those funds may be reinvested in his or her separate business, *see Keyes v. Keyes*, 2015 UT App 114, ¶ 30, 351 P.3d 90. Under such circumstances, one spouse's effort or investment may render the other spouse's underlying asset, its appreciated value, or some portion thereof subject to equitable distribution. *See, e.g., Schaumberg*, 875 P.2d at 602–03.

¶36 While spouses often contribute to one another's financial success in a variety of ways, Utah law draws a line between contributions that qualify as "enhancement, maintenance or protection" of a spouse's separate property and those that do not. *See Jensen v. Jensen*, 2009 UT App 1, ¶¶ 11, 16, 203 P.3d 1020 (citation and internal quotation marks omitted). Under Utah law, perhaps the most common type of spousal assistance—taking on some measure of household or family responsibilities to allow the other spouse to spend time enhancing the value of his or her separate property—has been rejected as a standalone basis for awarding separate property under the contribution theory. *See id.* ¶ 16.

¶37 As this court concluded in *Jensen*, one spouse's efforts to "maintain[] the household," provide childcare, and run a part-time business that "contributed to [the] family finances" were insufficient to justify awarding even "part" of the appreciated value of the other spouse's interest in the corporation of which he was president. *Id.* ¶¶ 4, 10–11, 15–16 (internal quotation marks omitted). Although the wife's efforts may have enabled her husband to devote his attention to his employment, she had not sufficiently contributed to the increase in value of the corporation's equity: "Wife did not assist in running the business nor contribute in any way to its increase in equity. Moreover, it [was] unclear whether the increase in equity was due to anything other than inflation." *Id.* ¶ 16. Likewise, in *Kunzler v.*

*Kunzler*, the contribution exception was not triggered by one spouse's assumption of household responsibilities, which allowed the other spouse "to focus his time and energy on preserving and increasing the value" of his separate property. 2008 UT App 263, ¶¶ 19 & n.5, 32, 37, 190 P.3d 497.

¶38 The division of labor among married parties may take any number of forms, and the give-and-take often inherent in marital relationships is generally not a sufficient basis for judicially rewriting title to property. The presumption that parties retain their separate property at divorce would be rendered largely irrelevant if rebutted by any spousal effort that freed the other spouse to work on his or her separate property. Thus, for purposes of this exception, direct involvement with or financial expenditures toward a spouse's separate property appear to be key.

¶39 In this case, Ms. Lindsey was undisputedly responsible for meeting many of the parties' household and family needs throughout the marriage. She left some responsibilities to Mr. Lindsey, but she was "focus[ed] on caring for the parties' child and managing the maintenance and upkeep of the household," and her efforts enabled Mr. Lindsey to focus more freely on his work. However, as set forth above, such efforts cannot themselves support an award of Mr. Lindsey's business interests for purposes of this exception.

¶40 The undisputed evidence before the trial court was that Ms. Lindsey was not involved in the creation, organization, or ongoing affairs of Mr. Lindsey's business. While Ms. Lindsey helped Mr. Lindsey strengthen relationships with his clientele, and on several occasions hosted and entertained his clients, she did not identify any concrete benefit that accrued to Mr. Lindsey's business interests due to her efforts nor did she point to any other involvement with or services she allegedly provided to Prime Holdings, and it is undisputed that she never acted as its employee. Moreover, Ms. Lindsey did not contend that Mr.

Lindsey elected to forgo salary or other compensation that would have benefited the marriage so that those funds could be reinvested in his business, *cf. Keyes v. Keyes*, 2015 UT App 114, ¶ 30, 351 P.3d 90; *supra* ¶ 33 n.4, and it was undisputed that Mr. Lindsey received significant compensation as well as dividends during the marriage, which were treated as marital income and thus benefited both parties.

¶41 The trial court thus correctly ruled, as a matter of law, that Ms. Lindsey's household and family responsibilities, coupled with her intermittent assistance in entertaining and hosting business clients, did not enhance, maintain, or protect Mr. Lindsey's business interests for purposes of the contribution exception. As noted above, we generally "defer to a trial court's categorization and equitable distribution of separate property," *Keyes*, 2015 UT App 114, ¶ 29, and the court's determinations in that regard are presumptively valid, *see Dahl v. Dahl*, 2015 UT 79, ¶ 119. On this record, however, the trial court properly concluded that it had no discretion to award a portion of Mr. Lindsey's business interests. Even "view[ing] the facts and all reasonable inferences drawn therefrom in the light most favorable to" Ms. Lindsey, *see Jones & Trevor Mktg., Inc. v. Lowry*, 2012 UT 39, ¶ 9, 284 P.3d 630 (citation and internal quotation marks omitted), she did not enhance, maintain, or protect the value of Mr. Lindsey's business interests for purposes of the contribution exception.

¶42 Ms. Lindsey argues otherwise, citing *Dunn v. Dunn*, 802 P.2d 1314 (Utah Ct. App. 1990), and *Elman v. Elman*, 2002 UT App 83, 45 P.3d 176, but those cases do not support her claim. *Dunn* involved a corporation that was presumptively marital property because it was "established during the marriage." *See Dunn*, 802 P.2d at 1317–18. The general rule requiring equal division of marital property therefore applied, particularly given both spouses' contributions to the corporation and one spouse's unpaid "bookkeeping and secretarial services" and "sole responsibility of running the household and managing the

household accounts." *See id.* at 1318. Because the corporation was properly considered marital property, subject to a fifty-fifty split, the trial court had erred in concluding otherwise. *See id.; see also Lee v. Lee*, 744 P.2d 1378, 1380–81 (Utah Ct. App. 1987) (reversing and remanding for award of an "equitable share of the corporation," which was "established after the parties' marriage" and the value of which "was actualized during the marriage").

¶43    This court's decision in *Elman* is similarly inapplicable to the contribution exception. In *Elman*, the trial court determined that neither the commingling nor the contribution exception had been satisfied. 2002 UT App 83, ¶ 20. Nevertheless, the trial court awarded the wife a portion of the husband's separate property, and the issue on appeal was whether that award could be supported under the third exception—achievement of a fair and equitable result under extraordinary circumstances. *Id.* ¶¶ 19–20, 30. As in *Dunn,* the discussion and ruling in *Elman* was not tied to the contribution exception, *see id.*, and thus offers no support for Ms. Lindsey's position here.[5]

---

5. *Dunn v. Dunn*, 802 P.2d 1314 (Utah Ct. App. 1990), and *Elman v. Elman*, 2002 UT App 83, 45 P.3d 176, have occasionally been referenced in the context of the contribution exception. *See, e.g., Jensen v. Jensen*, 2009 UT App 1, ¶ 14, 203 P.3d 1020 ("*Mortensen, Dunn*, and *Elman* appear to require more active participation and contribution by the nonowner spouse . . . ."). But the rules discussed in *Dunn* and *Elman* are specific to the issues before the court in each instance. *See Child v. Child*, 2008 UT App 338, ¶ 10 n.5, 194 P.3d 205 ("[T]he award in *Dunn* was based on a business established during the marriage. When the *Dunn* court evaluated a premarital asset, on the other hand, it acknowledged the rule [that parties generally retain the separate property they brought into the marriage, including any appreciation of that property]." (citation omitted)), *rev'd on other grounds*, 2009 UT 17, ¶¶ 2–3, 206 P.3d 633 (per curiam).

¶44   Ms. Lindsey also argues that the trial court's ruling erroneously excluded "the parties' largest asset" from the marital estate, such that Ms. Lindsey could not receive an equitable apportionment regardless of how the estate was divided. But separate property is usually excluded when determining whether a property division is equitable. *See Mortensen v. Mortensen*, 760 P.2d 304, 308 (Utah 1988). "The remaining property should be divided equitably between the parties," and "[a]ny significant disparity in the division of [that] property should be based on an equitable rationale other than on the sole fact that one spouse is awarded his or her" separate property. *Id.* The trial court thus correctly concluded that Ms. Lindsey's efforts did not support an award of Mr. Lindsey's business interests under the contribution exception.

## II. The Extraordinary Circumstances Exception

¶45   Ms. Lindsey also challenges the trial court's decision not to award a portion of Mr. Lindsey's business interests to her under the general exception for extraordinary circumstances. According to Ms. Lindsey, the trial court limited "application of the equity exception to . . . providing Mr. Lindsey a 'reasonable return' on his premarital [business] interest[s], rather than applying the . . . exception to the equities of the entire matter at the conclusion" of trial. She asserts that the relatively low rate of return earned by Mr. Lindsey on his business interests did not preclude an award on equitable grounds, and the court was required to wait until trial to determine whether Mr. Lindsey's business interests could be awarded solely to him. In Ms. Lindsey's view, the post-trial property division created a "drastic imbalance of equities" requiring that the award of Mr. Lindsey's business interests be overturned.

¶46   Under Utah law, a spouse's separate property may be awarded to the other spouse "in extraordinary situations where equity so demands." *Elman v. Elman*, 2002 UT App 83, ¶ 19, 45 P.3d 176 (citation and internal quotation marks omitted). The bar

for establishing an extraordinary situation is high, traditionally requiring that "invasion of a spouse's separate property" is "the only way to achieve equity." *Kunzler v. Kunzler*, 2008 UT App 263, ¶ 35, 190 P.3d 497. A quintessential extraordinary situation arises when a spouse owns separate property but lacks income to provide alimony; in that circumstance, "an equitable distribution of the [separate property] would be well within the trial court's discretion." *See id.* ¶ 37; *see also Burt v. Burt*, 799 P.2d 1166, 1169 (Utah Ct. App. 1990) ("The court may award an interest in the inherited property to the non-heir spouse in lieu of alimony."). An extraordinary situation has also arisen under "very unique" circumstances in which, absent the exception, a husband would have shared in profits his wife created as to their marital property, but she would not have shared in profits he created—and which she enabled him to create—with respect to his separate property. *Elman*, 2002 UT App 83, ¶ 24 & n.5.

¶47 Depending on the facts of a specific case, a court might take into account the rate of return earned on separate property during the marriage when determining whether an extraordinary situation exists or in calculating the amount of any such award. *See, e.g., id.* ¶¶ 20, 26, 29–30 (affirming an award of "a small share of the appreciation on [the husband's] partnership interests," which was "only above a reasonable rate of appreciation"). But an award of separate property may also be independent of any rate of return earned on the property during the marriage. *See Henshaw v. Henshaw*, 2012 UT App 56, ¶ 20 n.7, 271 P.3d 837 (rejecting the argument that, because the spouse's separate property declined in value during the marriage, the other spouse could not receive an equitable interest under the "extraordinary situations" exception (citation and internal quotation marks omitted)). If a court were to award separate property due to a spouse's inability to pay alimony, for example, that award could well be made irrespective of the rate of return earned on the property during the marriage.

¶48   In this case, Ms. Lindsey asserts the trial court improperly rejected her claim of extraordinary circumstances based solely on the business interests' low rate of return. As noted in the trial court's written decision, the court considered the "rate of return" on Mr. Lindsey's business interests, concluded that the rate was "well below the typical . . . return . . . for a closely held business," and awarded Mr. Lindsey's business interests solely to him. But that was not the entirety of the trial court's ruling. The court also concluded that any appreciation on Mr. Lindsey's business interests was, given the low rate of return, attributable to his premarital assets rather than his work effort during the marriage; Mr. Lindsey was compensated commensurate with his work effort during the marriage; Mr. Lindsey was not undercompensated in an effort to grow the business; and the amount of compensation and dividends Mr. Lindsey received (which benefitted both parties) far exceeded the increase in the value of his equity. Ms. Lindsey does not challenge any of these conclusions or assert that the rate of return could not be considered in determining whether extraordinary circumstances existed.

¶49   Moreover, even assuming the trial court had erroneously considered only the low rate of return, that would not alter the outcome on appeal. "We may affirm a grant of summary judgment upon any grounds apparent in the record." *McBroom v. Child*, 2016 UT 38, ¶ 18 (citation and internal quotation marks omitted). The overriding consideration for a property division generally, and the underlying purpose of the equitable circumstances exception, is to ensure an equitable outcome. *Cf. Granger v. Granger*, 2016 UT App 117, ¶ 15, 374 P.3d 1043. As set forth below, the record reveals no inequity here.

¶50   Ms. Lindsey summarily argued in the trial court that granting summary judgment for Mr. Lindsey could prevent an equitable outcome, without specifying how that might occur or pointing to any disputed facts bearing on that question. In contrast, Mr. Lindsey presented evidence that no inequity would

follow from an award of summary judgment in his favor, as it was undisputed that the parties had benefitted from Mr. Lindsey's work efforts while married and Ms. Lindsey would be awarded alimony as part of the final divorce decree.

¶51   Specifically, Mr. Lindsey demonstrated that he was highly compensated during the marriage, which enabled the parties to enjoy a high standard of living, and there was no contention that Mr. Lindsey was undercompensated or that he reduced his salary so that those funds could be reinvested to enhance his equity in the business. *Cf. Keyes v. Keyes*, 2015 UT App 114, ¶ 30, 351 P.3d 90. In addition, it was undisputed that Ms. Lindsey enjoyed the benefit of payouts from Mr. Lindsey's business interests during the marriage; over $2 million in dividends were paid to Mr. Lindsey due to his ownership of Prime Holdings stock and, in Ms. Lindsey's words, those dividends were "used in the marriage as marital income."

¶52   Ms. Lindsey thus shared substantially in the benefits of Mr. Lindsey's business interests during the marriage. Ms. Lindsey's limited argument in the trial court failed to set forth any basis for concluding that equity *also* required awarding some portion of Mr. Lindsey's business interests to her. Ms. Lindsey bore the burden of establishing an exception to the general rule that each party retains the separate property he or she brought into the marriage, including any appreciation of that property, *cf. Elman v. Elman*, 2002 UT App 83, ¶¶ 18, 32, 45 P.3d 176, and she did not "set forth [any] specific facts showing that there [was] a genuine issue for trial" on this matter, *see Jones & Trevor Mktg., Inc. v. Lowry*, 2012 UT 39, ¶ 30, 284 P.3d 630 (citation and internal quotation marks omitted).

¶53   On appeal, Ms. Lindsey fleetingly asserts that her contributions to the marriage and to the business "cut in favor" of an award of Mr. Lindsey's business interests for purposes of the equitable circumstances exception. Even assuming this single sentence sufficiently briefed Ms. Lindsey's argument, *but see*

*West Jordan City v. Goodman*, 2006 UT 27, ¶ 29, 135 P.3d 874 (suggesting otherwise), we are unaware of any Utah appellate decision characterizing a spouse's assumption of substantial household and childcare duties, coupled with the sort of limited involvement and well-established premarital business present here, as an extraordinary circumstance. *See, e.g., Jensen v. Jensen*, 2009 UT App 1, ¶¶ 16–17, 203 P.3d 1020 (concluding that the spouse's household, childcare, and part-time work efforts were insufficient to support an award of separate property); *Kunzler v. Kunzler*, 2008 UT App 263, ¶ 37, 190 P.3d 497 (concluding that "an equitable distribution . . . would be well within the trial court's discretion" given the spouse's household duties *and* the other spouse's potential inability to provide sufficient alimony); *Elman*, 2002 UT App 83, ¶¶ 24 & n.5, 30 (affirming an award of separate property given the spouse's active management of the household *and* the "very unique" situation in which the spouse's efforts substantially increased the value of marital property); *cf. Savage v. Savage*, 658 P.2d 1201, 1202–04 (Utah 1983) (upholding a division of property given the spouse's household and childcare duties *and* the fact that "[v]irtually the entire present value of the corporations was developed during the marriage"). Under these circumstances, Ms. Lindsey's contributions did not create an extraordinary situation.

¶54   Ms. Lindsey also asserts the trial court was required to, but did not, consider several additional factors in determining whether the exception applied, including "the parties' health, [their] standard of living and respective financial conditions, their needs and earning capacities, the duration of the marriage, what the parties gave up by the marriage, and the relationship the property division has with the amount of alimony awarded." (Citing *Naranjo v. Naranjo*, 751 P.2d 1144, 1147–48 (Utah Ct. App. 1988).) Ms. Lindsey merely recites these factors without applying them to the facts of her case. She does not indicate how the alleged failure to consider these factors led to an inequitable result, nor does she cite to any part of the record containing evidence or argument on these issues. Ms. Lindsey similarly

claims that the trial court was required to delay its decision and "hear[] all equitable issues more fully at trial," but makes no preserved argument, *see supra* ¶ 33 n.4, as to how that delay would have led to a different result. Thus, these arguments are inadequately briefed. *See Goodman*, 2006 UT 27, ¶ 29 ("A brief must go beyond providing conclusory statements and fully identify, analyze, and cite its legal arguments." (citation and internal quotation marks omitted)). "[A]n appellant who fails to adequately brief an issue will almost certainly fail to carry its burden of persuasion on appeal," *Bank of America v. Adamson*, 2017 UT 2, ¶ 12 (citation and internal quotation marks omitted), and that is the case here.

¶55 Finally, Ms. Lindsey again points to the overall disparity between the value of the property awarded to her and the value of the property awarded to Mr. Lindsey, if his separate property is included. But as we have discussed previously, *supra* ¶ 44, Mr. Lindsey's separate property is not taken into account when determining whether the property division was equitable. Accordingly, the trial court correctly concluded that the case did not present extraordinary circumstances supporting an equitable adjustment in the ownership of Mr. Lindsey's business interests.

CONCLUSION

¶56 The trial court correctly granted summary judgment awarding Mr. Lindsey's business interests to him as separate property. No undisputed facts prevented the trial court from making that determination at the summary judgment stage. Ms. Lindsey's efforts were insufficient to satisfy the contribution exception, and there were no extraordinary circumstances warranting an award of Mr. Lindsey's business interests to Ms. Lindsey. Accordingly, the judgment of the trial court is affirmed.

––––––––––––